**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paula R. Guth, | No. CV-08-1909-PHX-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| Radha Corporation, an Arizona corporation dba Best Western Hotel and Western Casa Grande Suites; Bakul Mehta and Bavana Mehta, husband and wife, | |
| Defendants. | |

Pending before the Court is Defendants Radha Corporation and Bakul and Bavana Mehta's Motion for Summary Judgment. (Dkt. # 73.) For the following reasons, the Court grants the Motion in part and denies it in part.

## BACKGROUND

### I. The Parties

Plaintiff is a former breakfast-room hostess at the Best Western Casa Grande Suites ("Best Western"), a hotel in Casa Grande, Arizona. (Dkt. # 73, Ex. 1 at 2.) Defendant Radha Corporation ("Radha") is a California corporation authorized to do business in Arizona. (*Id.* at 1.)

The parties dispute each Defendant's role in this case. Both parties agree that Radha owned and operated Best Western from May 2005, when Radha purchased Best Western,

until October 2008, when Radha sold Best Western to Pinal Lodging LLC. (*Id.*) Both parties also agree that Defendants Bakul and Bavana Mehta (collectively, the "Mehtas")[1] were shareholders in, and directors and officers of, Radha, but Defendants further contend that the Mehtas never held any direct ownership interest in Best Western. (*Id.* at 1–2.) Plaintiff, however, also alleges in her Complaint that the Mehtas "dba Best Western . . . [were] the employer of Plaintiff" and that "Best Western Hotel and Best Western Casa Grande Suites are sole proprietorships owned by . . . [the Mehtas]." (Dkt. # 36 at 1.)

## II. Factual Background

In April 2007, Radha hired Tim Vorhies ("Vorhies") as Best Western's general manager with responsibility for the hotel's day-to-day operations. (Dkt. # 73, Ex. 1 at 2.) As general manager, Vorhies conducted a sexual harassment class for Best Western's employees and instituted an anti-sexual-harassment policy that prohibits, among other things, unwelcome sexual advances and sexual physical conduct. (*Id.*)

In August 2007, while Plaintiff was bending over a sink, Raul Neria ("Neria"), a maintenance employee at the Best Western, pinned Plaintiff down, ran his hands along her, and put his hands on her. (Dkt. # 73, Ex. 1 at 2.) Plaintiff reported Neria's actions to Cindy Isom ("Isom"), Best Western's head housekeeper, who said she would remedy the situation. (*Id.* at 3.) At some point, Vorhies then learned from Isom that Neria was being "overly friendly" with Plaintiff and other female employees. (*Id.*) While, with respect to Plaintiff, the Isom affidavit does not explicitly negate the assertion that Isom told Vorhies that Neria was being "overly friendly" with Plaintiff, the affidavit also states that Isom continuously raised other complaints about sexual incidents between Neria and other female employees.

After learning of this, Vorhies initiated an investigation concerning Neria and several other female employees, determining that Neria's conduct violated the sexual harassment policy. (*Id.* at 2–3.) Vorhies then discussed Plaintiff's complaint with Mr. Mehta and hired

---

[1] Some of the captions and briefs provided to the Court refer to the individual Defendants' last name "Mehta," while filings spell the name "Metha." The Court will spell the name "Mehta" in this Order.

1  a Spanish translator because Neria speaks little English. (*Id.*) Using the translator, Vorhies
2  reminded Neria of the anti-sexual-harassment policy, explained to Neria that there would be
3  consequences (including firing) if Neria failed to comply, and issued a written warning. (*Id.*;
4  Dkt. # 77, Ex. E.) According to Isom, Neria indicated that he would follow the sexual
5  harassment policy. (Dkt. # 77, Ex. E.)

6  Despite this meeting, Isom's affidavit suggests that the harassment continued, at least
7  with respect to female employees other than Plaintiff. At some point in time, Isom reported
8  to Vorhies that Neria had harassed both her and other female employees.[2] (Dkt. # 77, Ex. E.)
9  For instance, Isom indicated that she told both Vorhies and Mr. Mehta that Neria would make
10 other female employees feel uncomfortable by stalking them, staring at them, and trying to
11 touch them. (*Id.*) Isom further alleged that Neria attempted to kiss her and shoved his penis
12 into her back. (*Id.*) After reporting these incidents to management, Isom contends that
13 neither Vorhies nor Mr. Mehta took any action and that Vorhies told Isom that she "need[ed]
14 to do things [his] way" so that she "can keep [her] job another day." (*Id.*) Defendants objects
15 to Isom's affidavit as hearsay, but the Court considers the affidavit for purposes of this
16 Motion only. First, it is not clear from Isom's affidavit that she knew about harassment only
17 because other women told her about it; rather, Isom arguably has personal knowledge of the
18 harassment, meaning she need not rely on other employees' statements to testify. Second,
19 to the extent that Defendants contend Isom's testimony as to what she told Vorhies is
20 hearsay, the statements are not hearsay because they would be offered not to prove the truth
21 of the matter asserted (that harassment occurred), but rather to show Vorhies's knowledge
22 of claims of harassment. *See Stevens v. Moore Bus. Forms, Inc.*, 18 F.3d 1443, 1449 (9th Cir.
23 1994) (holding that statements admitted to prove a person's knowledge, as opposed to prove
24 the truth of the matters asserted, are not hearsay). Isom's affidavit is not critical to

---

[2] The record is somewhat unclear as to when these other incidents occurred and when Isom brought them to Vorhies's and Mr. Mehta's attention. It is plausible, however, that at least some of these incidents occurred prior to the first inappropriate contact between Neria and Plaintiff in August 2007 and that some occurred after August 2007.

determining if Neria created a sexualized environment, but instead the affidavit importantly demonstrates Defendants' knowledge of allegations about Neria's actions and Defendants' subsequent refusal to investigate or to make corrections.

While a reasonable jury could find that Isom's affidavit demonstrates that Neria continued to harass other female employees even after Vorhies instructed him not to do so, the parties do not dispute that Neria stayed away from Plaintiff from August 2007 until at least March of 2008. (Dkt. # 73, Ex. 1 at 4.) In the Spring of 2008, Plaintiff began seeing Neria taking the trash bags from the breakfast area, during which time Plaintiff saw Neria about two of every five days. (Dkt. # 73, Ex. 1 at 4.) Plaintiff explained that, in mid-to-late-March, she told Vorhies that Neria was "getting friendly again" and that she wanted to "get him out of [her] hair," but "maybe in a bit stronger terms." (*Id.*) Vorhies told Plaintiff he would take care of it, but it is unclear what action, if any, Vorhies took in response to this complaint. (*Id.*)

Later in the Spring of 2008, on what the parties seem to agree is April 7, 2008, Neria approached Plaintiff from behind, gave her a "bear hug," bit her on the ear and the neck, and said that it was his birthday.[3] (*Id.* at 5–6.) Plaintiff contends that, shortly after the event, she informed Vorhies, who told Plaintiff that he would take care of it.[4] (*Id.* at 6.) Vorhies met with Neria about the event, but Neria had some difficulty comprehending because of the language barrier. (*Id.*) To provide better communication, Vorhies apparently attempted to contact an interpreter, but was unable to locate one. (*Id.*) While Vorhies attempted to find

---

[3] Plaintiff initially alleges different dates for the incident, but Plaintiff's Response admits the event occurred on April 7, 2008. At this time, the Court need not make a factual determination of the date of this event. As discussed below, even if this event took place on April 7, Plaintiff still has still created an issue of fact as to whether a hostile work environment existed.

[4] Plaintiff made other statements suggesting that she did not immediately inform Vorhies of the event, but this is an issue of fact. The parties also dispute whether Plaintiff told Vorhies only that Neria was being "overly friendly" or whether Plaintiff said that Neria touched her inappropriately.

- 4 -

1 an interpreter, Mr. Mehta also told Neria not to touch any female employees. (*Id.*)
Defendants do not appear to have taken any other action at this time.

On April 8, 2008, which was as little as one day after the previous incident, Neria and Plaintiff were not scheduled to be at the Best Western at the same time because Neria's scheduled start-time was one hour after Plaintiff's scheduled end-time. (*Id.* at 7.) Neria apparently arrived early. (*Id.*) At this point, Neria put Plaintiff into a position where she could not move, with an erection in her buttocks, and grabbed her breasts. (*Id.*) Vorhies observed this on a television monitor, and he immediately called Plaintiff into the breakfast room to tell her that he would deal with the incident.[5] (*Id.* at 7–8.) According to Vorhies, he told Neria to stay away from the female employees for the rest of the day. (*Id.* at 8.) After Vorhies separated the two, Plaintiff never interacted with Neria again. (*Id.* at 9.)

Vorhies contacted Mehta, and the two agreed to call an interpreter to do more investigation and to monitor Neria. (*Id.* at 8.) At some point, Plaintiff left and contacted the police, who eventually discussed the situation with Vorhies and Neria, although the language barrier again limited conversation. (*Id.*) In the meantime, Vorhies told Neria to leave the premises until the next day. The police department and Vorhies continued their investigation by interviewing Neria with a Spanish-speaking officer and by interviewing thirteen female employees. (*Id.* at 9.) On April 11, 2008, three days after the final incident, Vorhies terminated Neria. (*Id.*)

Plaintiff contends she was unaware that Neria had been fired,[6] and she quit working at Best Western on April 22, 2008. Plaintiff explained that she quit because she felt that management did not correct or stop Neria's behavior and because she felt threatened. (Dkt.

---

[5] Plaintiff contends that Defendants should be barred from presenting evidence suggesting that Neria did not touch Plaintiff on April 8 because Defendants allegedly destroyed the video that shows this incident. While Plaintiff's allegations, if true, may warrant an adverse inference in Plaintiff's favor, no additional sanction is necessary at this point because Defendants agree with Plaintiff's account of the facts on this issue.

[6] The parties dispute whether Plaintiff knew Neria no longer worked at Best Western.

1  # 77 at 14.) After apparently proceeding through her administrative remedies, Plaintiff filed this lawsuit, alleging violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 28 U.S.C. § 2000e, *et seq.*

**LEGAL STANDARD**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Then, the burden is on the nonmoving party to establish a genuine issue of material fact. *Id.* at 322–23. The nonmoving party "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). At the same time, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

**DISCUSSION**

Plaintiff has established a genuine issue of material fact regarding whether Defendants are liable for creating a hostile work environment. Plaintiff, however, has not established any

1 genuine issues sufficient to defeat summary judgment on her constructive discharge and
2 punitive damages claims. Plaintiff also has not created a genuine issue of fact as to whether
3 the Mehtas owned Best Western, and thus the Mehtas are not subject to liability.

**I.     Summary Judgment Is Inappropriate on the Hostile Work Environment Claim.**

Title VII prohibits an employer from discriminating based on sex, and this includes sexual harassment. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting an "employer" from discriminating based on sex); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (interpreting discrimination to include sexual harassment). Where a plaintiff alleges "harassment by a co-worker[,] . . . the employer can be held liable only where 'its own negligence is a cause of the harassment.'" *Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir. 2001) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998)). "Title VII liability is direct, not derivative: An employer is responsible for its own actions or omissions, not for the co-worker's harassing conduct." *Id.* at 1191–92. If the employer becomes aware of sexually-harassing conduct, therefore, an employer is liable only if it "fails to take corrective action" or "takes inadequate action that emboldens the harasser to continue [his or her] misconduct." *Id.* at 1192; *see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 811 (7th Cir. 2000) (explaining that the employer's negligence is thus based not on "what occurred before the employer was put on notice[,] . . . but for the harm that the employer inflicted on the plaintiff as a result of its inappropriate response").

This corrective action must be "'reasonably calculated to end the harassment[,]'" which requires two steps. *Swenson*, 271 F.3d at 1192 (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 875 (9th Cir. 2001)). First, the employer must take "temporary steps to deal with the situation while it determines whether the complaint is justified." *Id.* Second, the employer must take "permanent remedial steps . . . once it has completed its investigation." *Id.* Additionally, "[t]he reasonableness of the remedy depends on [the employer's] ability to: (1) 'stop harassment by the person who engaged in the harassment' . . . and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1186 (9th Cir. 2005). In making this determination, the "most

- 7 -

significant immediate measure an employer can take . . . is to launch a prompt investigation to determine whether the complaint is justified." *Swenson*, 271 F.3d 1184, 1193 (9th Cir. 2001). And to prevent future harassment, an employer must take some sort of action against the co-worker, which may include discipline or counseling and admonition. *Star v. West*, 237 F.3d 1036, 1039 (9th Cir. 2001) (discussing that counseling and admonition may be sufficient if reasonable in the circumstances); *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997) (discussing disciplinary action).

In this case, a reasonable jury could conclude that Defendants' actions were not reasonably calculated both to deal temporarily with the situations pending investigations and to permanently prevent such conduct. The Ninth Circuit has noted that the "[l]ack of adequate discipline [for harassment of other people] might be a relevant consideration in assessing the employer's liability once a hostile work environment is shown to exist." *Brooks v. City of San Mateo*, 229 F.3d 917, 925 n. 5 (9th Cir. 2000). First, Defendants' actions regarding the August 2007 incident were arguably inadequate. Although Vorhies hired a translator, issued a written warning, and received verification from Neria that sexual harassment was inappropriate, a reasonable jury could conclude that Vorhies did not implement a reasonable remedy to stop Neria's harassment in August 2007. *See Hardage*, 427 F.3d at 1186. For instance, Vorhies did not formerly discipline Neria, suspend him, or even require Neria and Plaintiff to work separately.

More importantly, even after August 2007, Plaintiff, through Isom's affidavit, admissibly asserts that Vorhies was aware that Neria continued to harass other female employees. According to Isom, Vorhies took no action to control Neria or even to remind him of the sexual harassment policy; rather, Vorhies allegedly told Isom that she "need[ed] to do things [his] way" so that she "can keep [her] job another day." (Dkt. # 77, Ex. E). A reasonable jury could conclude that Vorhies's failure to discipline Neria regarding these complaints emboldened Neria to continue the harassment of other women, and ultimately, of Plaintiff. *See Swenson*, 271 F.3d at 1192 (holding that an employer is liable for "embolden[ing] a harasser); *Brooks*, 229 F.3d at 925 n. 5 (noting that the lack of discipline

for other incidents of harassment is a "relevant consideration in assessing the employer's liability").[7]

Moreover, Defendants' actions in Spring 2008 were arguably inadequate. In March 2008, Plaintiff contends that she told Vorhies that Neria was "getting friendly again" after Plaintiff saw Neria two of every five days in the breakfast area. Although Vorhies said he would deal with the complaint, Vorhies apparently did nothing. On or about April 7, 2008, Neria bear hugged Plaintiff and bit her neck and ear, saying it was his birthday. Arguably, because over seven months had passed since the last time Neria touched Plaintiff, it is reasonable that Defendants would not have expected such an event to occur. This ignores, however, the numerous other examples of Neria inappropriately contacting women and of Vorhies ignoring the complaints to the point where Neria was arguably emboldened to continue his actions.

Furthermore, Defendants' actions after the bear hug incident were arguably not reasonably calculated to prevent future harassment. To be sure, both Vorhies and Mr. Mehta attempted to instruct Neria not to touch female employees, although this task was made more difficult by the language barrier and the inability to obtain an interpreter. However, even in light of the seriousness of two physical encounters with Plaintiff and numerous encounters with other employees, neither Vorhies nor Mr. Mehta took additional measures to prevent Neria's contact with Plaintiff. Simply instructing Neria not to touch female employees and relying on a one-hour difference in Neria's and Plaintiff's scheduled shifts was arguably insufficient, especially given that Neria had previously demonstrated his unwillingness to follow the sexual harassment policy.

---

[7] Defendants offer testimony from two of the female employees that Isom alleges were harassed; these women imply that Defendants appropriately prevented future acts of harassment against them. This testimony, however, does not address every allegation that Isom includes and, in any event, is a factual dispute inappropriate for resolution upon a motion for summary judgment.

## II. Summary Judgment Is Appropriate on the Constructive Discharge Claim.

Constructive discharge exists if "working conditions [are] so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004); *see also Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994) (requiring a showing that "a reasonable person in [her] position would have felt that [she] was forced to quit because of intolerable and discriminatory working conditions") (internal quotations omitted). It involves "something more" than normal harassment, and constructive discharge does not lie "[u]nless conditions are beyond 'ordinary' discrimination[.]" *Suders*, 542 U.S. at 142 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)). In general, a constructive discharge claim generally does not lie if the alleged harasser has been fired prior to the plaintiff's resignation because the conditions "must be intolerable at the time of the employee's resignation." *See Steiner*, 25 F.3d at 1465 (internal quotations and alterations omitted). In *Steiner*, the plaintiff's constructive discharge claim failed because the alleged harasser had been fired two-and-a-half months before the plaintiff resigned, meaning the harassment did not exist at the time of plaintiff's resignation. 25 F.3d at 1465

Similarly, notwithstanding the fact that Neria's actions were extreme, Plaintiff cannot maintain a constructive discharge claim because Neria had been fired nearly two weeks before she quit working at Best Western. Plaintiff's working conditions could not have been intolerable at the time of her resignation because Neria was no longer working with her. Plaintiff contends that she was unaware of Neria's termination, but Plaintiff does not explain how this is relevant. Even if she did not know that Neria had been fired, Plaintiff fails to demonstrate how her working conditions continued to be intolerable even after her harasser was no longer with Best Western. While Plaintiff may have still been upset over the Defendants' inability to prevent Neria's actions, Plaintiff cannot show intolerable conditions at the time of her resignation.

///

///

**III.   Plaintiff May Not Seek Punitive Damages.**

To recover punitive damages under Title VII, Plaintiff must demonstrate that Defendants acted with "malice or reckless indifference." 42 U.S.C. § 1981a(b)(1); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 540 (1999). This requires "a showing beyond the threshold level of intent required for compensatory liability." *Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir. 1998). Although an employer may be liable for punitive damages where the employer "discriminate[s] in the face of a perceived risk that its actions will violate federal law[,]" an employer does not act with reckless indifference where it undertakes "good faith efforts at Title VII compliance." *Kolstad*, 527 U.S. at 536, 544. In the sexual harassment context, a plaintiff may demonstrate reckless indifference, for example, "where the employer completely failed to address repeated complaints of pervasive sexual harassment." *EEOC v. Wal-Mart Stores, Inc.*, 156 F.3d 989, 993 (9th Cir. 1998) (citing *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982 (4th Cir. 1997)). In this case, a reasonable jury could not conclude that Defendants acted with reckless indifference. Although, as discussed *supra* in Section I, Defendants could have taken more effective action to prevent Neria from harassing Plaintiff, Defendants did not completely fail to address the complaints. To the contrary, Defendants undertook good faith efforts at compliance with Title VII. Vorhies and Mr. Mehta reminded Neria of the sexual harassment policy, gave him a written warning, and instructed him not to touch any female employees. Vorhies and Mr. Mehta later investigated both the biting incident and the final incident on April 8. After the final incident, Vorhies also coordinated with the police to investigate and fired Neria within three days. These actions may not be sufficient to grant summary judgment on a hostile work environment claim, but they do make summary judgment appropriate regarding punitive damages.

**IV.   The Individual Defendants Are Not Liable.**

Title VII does not impose liability on individuals who are not themselves "employers." *See* 42 U.S.C. § 2000e(b) (establishing Title VII liability against "employers"); *Miller v. Maxwell's Intern. Inc.*, 991 F.2d 583, 587–88 (9th Cir. 1993) ("[I]ndividual

1  defendants cannot be held liable under Title VII . . . There is no reason to stretch the liability
2  of individual employees beyond the respondeat superior principle intended by Congress.").
3  Furthermore, under Arizona law, the "corporate structure is a separate legal entity which has
4  the legitimate purpose of insulating individuals from personal liability for acts done on behalf
5  of the corporation." Malisewski v. Singer, 123 Ariz. 195, 196, 598 P.2d 1014, 1015 (1979).
6  Summary judgment is appropriate on all claims against the Mehtas in their individual
7  capacities because the Mehtas were merely shareholders and employees of Radha, which
8  owned Best Western.

9  The parties dispute the Mehtas role in managing Best Western. Plaintiff contends the
10 Mehtas operated Best Western as a sole proprietorship. In contrast, Defendants assert (and
11 Plaintiff admits) that Radha owned Best Western, and that the Mehtas were employees and
12 shareholders of Radha who operated Best Western. Plaintiff presents evidence that
13 purportedly demonstrates that the Mehtas owned Best Western, but this evidence does not
14 create a genuine issue of fact.

15 First, Plaintiff offers a sales agreement selling Best Western to Randolph Tenney
16 ("Tenney"). (Dkt. # 77, Ex. A.) The sales agreement is signed only by Mr. Mehta and by
17 Tenney and does not mention Radha. (*Id.*) Plaintiff likewise offers deposition testimony
18 from Mr. Mehta stating that he sold the business to Tenney. (Dkt. # 77, Ex. B.) The mere
19 fact that a sales agreement included Mr. Mehta's signature, however, does not necessarily
20 indicate Mr. Mehta's ownership. Mr. Mehta clarified that "when the Best Western . . . was
21 sold" that it was "sold . . . [b]y Radha Corporation" and "[n]ot by [the Mehtas] directly."
22 (Dkt. # 79, Ex. 1.) Mr. Mehta further explained that he "never had any direct ownership
23 whatsoever in the Best Western Casa Grande." (*Id.*) The reason the sales agreement bore Mr.
24 Mehta's individual signature is because Mr. Mehta was acting "as a party or director of
25 Radha Corporation." (*Id.*) Plaintiff offers no testimony to the contrary, and a reasonable jury
26 could not conclude that the sales agreement establishes that the Mehtas had an ownership
27 interest in Best Western.
28

Additionally, Plaintiff offers other evidence to show that the Mehtas, as opposed to Radha, owned Best Western. For instance, Plaintiff offers one of her pay stubs that lists "Best Western Casa Grande," rather than Radha, in the heading. The pay stub, however, says nothing about the Mehtas' ownership interest in Best Western. Likewise, Plaintiff presents Mr. Mehta's testimony that all employment documents listed Best Western as the employer, but this testimony says nothing about the Mehtas' purported ownership in Best Western. (Dkt. # 77, Ex. C, D.) Rather, Mr. Mehta's explanation that Radha owned Best Western remains uncontroverted.

Furthermore, Plaintiff and Vorhies both testified that the Mehtas had told them that Best Western was their employer and that the Mehtas owned Best Western. Whatever Plaintiff may have thought or even whatever the Mehtas had said does not create a genuine issue of fact as to whether the Mehtas owned Best Western.

Most importantly, notwithstanding the evidence Plaintiff offers, Plaintiff has made a judicial admission that Radha owns Best Western. "Plaintiffs are bound by all factual assertions in the complaint because such assertions constitute judicial admissions." Strategic Diversity, Inc. v. Alchemix Corp., 2010 WL 94122 at *1 (D. Ariz. Jan. 5, 2010) (quoting Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc., 176 F.R.D. 329, 338 (C.D. Cal. 1997)). Here, Plaintiff's Complaint admits that "[a]t all times relevant Radha Corporation was the employer of Plaintiff and owned the Best Western Hotel that employed Plaintiff." Plaintiff's statement of facts in response to this Motion further admits that "[the Mehtas] are shareholders in, and directors and officers of, Radha." (Dkt. # 36 at 1.) By definition, the Mehtas cannot own Best Western as a sole proprietorship if Radha owns Best Western. "[A] sole proprietorship . . . does not have a separate legal existence from the individual business owner. Miller v. Hehlen, 209 Ariz. 462, 468, 104 P.3d 193, 199 (Ct. App. 2005). Therefore, for Best Western to be a sole proprietorship, as Plaintiff asserts, then Best Western would be indistinguishable from its owner; Plaintiff admits, however, that Radha is Best Western's owner. In fact, Plaintiff does not raise any genuine issues regarding whether Radha existed as an entity or whether Radha owned Best Western for any relevant period of time. Because

| 1 | Plaintiff has admitted that Radha is the true owner and employer, Plaintiff's evidence to the
| 2 | contrary is inapposite, and the Mehtas are not individually liable in this case.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Dkt. # 73) is **granted in part** and **denied in part**.

**IT IS FURTHER ORDERED** directing the Clerk of the Court **terminate** Bakul Mehta and Bavana Mehta as parties in this matter.

DATED this 9th day of March, 2010.

_____
G. Murray Snow
United States District Judge